# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Jeremy Gragg, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 for electronic evidence contained within an Apple iPhone with a black case (hereinafter **"Target Cell Phone 1"**), and an Apple iPhone with a green case (hereinafter **"Target Cell Phone 2"**). The Target Cell Phones are described herein and in Attachments A1-A2, and the information to be seized is described in Attachment B. The Target Cell Phones are currently held in a Kansas City, Missouri Police Department (KCPD) facility within the Western District of Missouri.

2. I am a Detective with the Kansas City, Missouri Police Department and have been assigned to the Gang Squad since October 2022. I am also cross certified as a Task Force Officer for the Federal Bureau of Investigations Safe Streets Violence Gangs Task Force. I have received training in conducting investigations related to persons involved in violence in the Kansas City, Missouri Metro Area, specifically focused on firearms and narcotics investigations. I have over sixteen years of law enforcement experience, as both a police officer and detective.

3. In connection with my official duties, I investigate criminal violations, to include, without limitation, 21 U.S.C. §§ 841, 843, and 846; and 18 U.S.C. §§ 922(g)(I), 924(a)(8), and 924(c). My training and experience have involved physical surveillance, execution of search warrants, arrests of countless drug traffickers, and the handling of cooperating sources and sources of information. During my tenure with the Kansas City, Missouri Police Department, I have communicated extensively with other state and federal law enforcement personnel who specialize in drug and firearm investigations. I also have extensive experience debriefing defendants,

participating witnesses, informants, and other persons who have personal experience and knowledge regarding various drugs and firearm-related crimes.

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5. The property to be searched is described in Attachments A1-A2 and herein as follows:

6. An Apple iPhone with a black case, Evidence Barcode Number P24051008 **(Target Cell Phone 1),** believed to be utilized by **Damyon COOK.**

7. An Apple iPhone with a green case, Evidence Barcode Number P24051009 **(Target Cell Phone 2),** believed to be utilized by **Damyon COOK.**

### PROBABLE CAUSE

8. On November 19, 2024, KCPD officers were conducting surveillance for a wanted party, Damyon Cook, a/k/a "Daymon Cook" (DOB: 12/23/1998), who had a felony warrant for aggravated assault out of Johnson County, KS, and a felony warrant out of Jackson County, Missouri Circuit Court for felon in possession of a firearm. COOK was prohibited from possessing firearms due to previous felony convictions in Jackson County, Missouri, for involuntary manslaughter and resist arrest for which he was convicted on July 25, 2019.

9. A search warrant was obtained in Jackson County, Missouri on November 18, 2024, for the location of COOK's cell phone. Detectives began utilizing electronic surveillance to locate and arrest COOK. At approximately 4:45 p.m., on November 19, 2024, detectives observed movement on COOK's phone and observed the phone travel from the area of Bannister and

Holmes to the area of Swope Parkway and Bmce R. Watkins Drive. At approximately 5:00 p.m., detectives observed a silver Mercedes sedan, MO license TL4M9B, back into the parking lot of 2515 Swope Parkway, Kansas City, Missouri. This is a location the detectives had previously associated with COOK. A black male matching the description of COOK exited the driver's seat of the Mercedes and walked around for a few minutes before reentering the Mercedes. A computer check of the license plate on the Mercedes responded to a female subject with an address of 9732 Locust, Kansas City, Missouri, located in the Western District of Missouri.

10. After a few minutes, the Mercedes left the parking lot and was cove1tly followed by detectives until it pulled into the Shell Xpress Mmt, 2601 Swope Parkway, Kansas City, Missouri, and back into a parking space. Detectives were able to confom that COOK was the driver and sole occupant of the Mercedes after he exited and entered into the front passenger seat of a silver Mercedes SUV, MO license EL2JOJ. COOK was inside of the vehicle for a few seconds, and he exited and walked back to the Mercedes sedan. COOK immediately left the parking lot of the gas station. Detectives believed from prior law enforcement training and experience that COOK had conducted a dmg transaction with the occupants of the Mercedes SUV.

11. Detectives continued to covertly follow COOK in the Mercedes. He drove to 1512 East 37th Street, Kansas City, Missouri, at approximately 5:40 p.m., and parked just west of the residence. Detectives knew that his residence was associated to the mother of one of COOK's children. COOK remained inside of the residence for a few minutes while leaving the Mercedes mnning. He returned outside and left the residence in the Mercedes.

12. COOK drove the Mercedes to the area of 8320 Hillcrest, Kansas City, Missouri, and backed into a parking space in front of the apartment building. An unknown subject approached the Mercedes and entered into the front passenger seat of the Mercedes for a few

3

seconds. The unknown subject exited and walked back towards the apartment building. Detectives believed this was another drng transaction conducted by COOK. COOK left the apaiiment complex and surveillance on the Mercedes was lost in the area of 87th and Interstate 435.

13. On November 20, 2024, at 7:00 a.m., detectives drove past 9732 Locust and observed the silver Mercedes that COOK had been driving the previous day backed into a parking space next to the residence. It was believed that COOK was living at 9732 Locust. Detectives continued monitoring COOK's cell phone activity throughout the day and observed the phone to be in the area of 75th and Troost at approximately 12:40 p.m. A few minutes later, a detective observed the silver Mercedes that COOK was previously driving travelling eastbound on Gregory approaching Bales. The Mercedes was observed backing in at a business located at 3801 Gregory, at 1:22 p.m. Detectives observed COOK exit the driver's seat at the business wearing a red jogging suit. There was an unknown subject seated in the front passenger seat.

14. The Mercedes left the business and was followed by covert surveillance to 3522 Cleveland, Kansas City, Missouri. COOK backed the Mercedes into the driveway, and three unknown subjects exited the residence and spoke with COOK at the diiver's window. After a few minutes, COOK left the residence in the Mercedes. He was then cove1ily followed by detectives until he pulled into the Cenex, 7501 Troost, Kansas City, Missouri. COOK backed the Mercedes into a parking space next to a gray Infiniti. The front passenger of the Mercedes exited and entered into the driver's seat of the gray Infiniti for a shmi time before getting back into the front passenger seat of the Mercedes with COOK.

15. At 1:45 p.m., KCPD Tactical Units conducted a car check on the silver Mercedes to a1Test COOK for his felony wa1Tants. COOK attempted to escape by reversing the Mercedes to create distance between his vehicle and the police vehicle, but officers pinned his vehicle against

4

a concrete banier to prevent his escape. COOK eventually exited the Mercedes but continued to ignore commands to lay on the ground. COOK eventually complied with officers after a noise flash diversionary device was deployed in his immediate vicinity, and he was placed into custody. COOK was holding two cell phones in hand when he exited the Mercedes. **Target Cell Phone 1,** an Apple iPhone with black case, and **Target Cell Phone 2,** an Apple iPhone with green case, were recovered from COOK after he was taken into custody. Both phones were on and were actively receiving phone calls and messages. The **Target Cell Phones** were placed into airplane mode to prevent any remote deletion of data from the devices, and they were later recovered at a cove1i police facility within the Western District of Missouri pending application of search wanants.

16. The front seat passenger of the Mercedes exited and got into the driver's seat of the Infiniti. He then fled out of the parking lot at a high rate of speed northbound on Troost. The Infiniti was cove1ily followed by detectives to 4100 East 36th Street and the driver was taken into custody. He was identified as L.M. During a search of L.M. incident to anest, officers located a cloth bag in his underwear that contained plastic bags of 1.23 grams of white powder and 3.26 grams of white rock-like substance which later tested positive for cocaine and cocaine base.

17. Officers contacted an employee of the Cenex, who advised that they did not want to the Mercedes left on their prope1iy. A tow was ordered for the Mercedes. Officers conducted an inventory of the Mercedes prior to tow and observed a Zastava Arms, AK-style semi-automatic pistol, bearing Serial Number Z92090678, wedged in between the driver's seat and center console. The AK-47 pistol was clearly visible from outside the driver's door of the Mercedes and was within the reach and control of COOK in the driver's seat. The AK-47 pistol was loaded with a round in the chamber and thirty rounds in the extended magazine.

18. Officers located a plastic bag containing approximately 269.47 grams of white rock-like substance under the driver's seat underneath where COOK was seated that later field tested positive for the presence of cocaine. A clear pan with white powder residue was located on the driver's seat where COOK was seated. A serving dish with green residue was located between the front passenger seat and center console. Officers located a plastic bag containing approximately 2.7 grams of white rock-like substance in the center console, which later field-tested positive for cocaine. Also, inside the center console was pre-packaged marijuana.

19. Officers located a red and black backpack on the rear passenger floorboard behind the front passenger seat which contained a clear plastic bag containing 884 blue circle pills with M30 imprint, weighing approximately 102.7 grams. These counterfeit pills are commonly found to contain fentanyl. Also, located in the backpack was a plastic pill bottle containing 3.5 white circle pills with M30 imprint and a pill bottle containing 20 blue oval shaped pills with A/17 imprint (9.44 grams). There was also more pre-packaged marijuana located in the backpack. Officers located a plastic bag containing approximately 146.55 grams of green leafy substance in the rear passenger floorboard behind the driver's seat.

20. Officers conducted a search of COOK incident to aITest and located 14 pink circle pills, weighing approximately 2.4 grams, in his front jacket pocket.

21. Detectives later viewed surveillance video from 7501 Troost, which showed L.M. aITive at the location in the gray Infiniti at 12:59 P.M. L.M. exited the Infiniti and walked over to the gray Mercedes that was parked at the gas pumps and entered into the front passenger seat. L.M. was not carrying a backpack with him when he entered into the Mercedes.

22. On November 20, 2024, after being advised of his *Miranda* rights, L.M. provided a statement to detectives. L.M. stated that he met COOK at 7501 Troost to purchase marijuana

from him, and COOK requested that he ride around with him for a while. L.M. said that COOK sold marijuana to another person while he was riding with him. L.M. denied knowing that a gun was in the car, and when shown a picture of the AK-47 pistol he said that he saw something sticking up from the seat but did not know what COOK had over there. L.M. admitted that he was a convicted felon and could not be around guns. L.M. admitted to the cocaine that was found in his underwear but denied that he bought it from COOK. He stated that he bought marijuana from COOK prior to the police contacting them at the gas station.

23. On November 21, 2024, a Felony Complaint was filed in the Western District of Missouri charging COOK with possession with the intent to distribute cocaine base, possession of a firearm in fmiherance of a drug trafficking crime, and felon in possession of a firemm.

24. Based on the foregoing, I believe that **Target Cell Phones** likely contain evidence related to the purchase and sales of illegal controlled substances, and illegal possession of fireaims. During my tenure as a detective and police officer with the Kansas City, Missouri Police Department, I have previously reviewed numerous cell phones for content regarding illegal drugs and firearms investigations, and in my prior experiences I know that people will commonly take pictures and videos of firearms on their phones and send to other people through text messages, emails, and social media. I am also aware from prior experiences that drug traffickers will use their cell phones to cqnduct drug transactions, and will commonly have text messages, pictures, and videos of drugs on their phone detailing their drug sales to others. I am also aware that drug traffickers will commonly use multiple cell phones in order to confuse and evade law enforcement who may be investigating them for drug and fireaim related offenses. I am therefore requesting a wan-ant to search and analyze the **Target Cell Phones.**

**TECHNICAL TERMS**

25. Based on my training and experience, I use the following technical tenns to convey the following meanings:

    a. Cellular telephone: a cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading info1mation from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for dete1mining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives.

    c. A pmiable media player: A portable media player (or "JV1P3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or

8

photographic files. However, a p011able media player can also store other digital data. Some p011able media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a p011able media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d.    GPS: A GPS navigation device uses the Global Positioning System to display its cmTent location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Eai1h can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.    PDA: A personal digital assistant, or PDA, is a handheld device used for stming data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a mem01y card or other removable storage media for st01ing data and a keyboard and/or touch screen for

9

entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removeable storage media can store any digital data. Most PDAs rnn computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for detennining the location of the device.

      f.      IP Address: An Internet Protocol Address (or simply "IP Address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range of 0-255, separated by periods (e.g. 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address to the Internet traffic sent from a directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static, that is, long-tenn IP addresses, while other computers have dynamic, that is, frequently changed IP addresses.

      g.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26.      Based on my training, experience, and research, I know that the **Target Cell Phones** have capabilities that allow it to serve as, but not limited to: cellular telephones, text messengers, cameras, media players, internet explorers, social media access, video recorders, and GPS navigation devices. In my training and experience, examining data stored on devices of this

type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### Electronic Storage and Forensic Analysis

27. Based upon my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed on the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

28. Forensic evidence. As further described in Attachment B, this application seeks pe1mission to locate not only electronically stored info1mation that might serve as direct evidence of the c1imes described on the wan-ants, but also forensic evidence that establishes how the Target Cell Phones were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Cell Phones because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted p01iion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search wmTant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other infonnation stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessmy to understand other evidence also falls within the scope of the wmnnt.

e.  Fmiher, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessmy to establish that a particular thing is not present on a storage medium.

29. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the wan-ant I am applying for would permit the examination of the **Target Cell Phones** consistent with the wmnnt. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many pmis of the **Target Cell Phones** to human inspection to detennine whether it is evidence described by the wan-ant.

30. *Manner of execution.* Because the wan-ant seeks only pemiission to examine a device already in law enforcement possession, the execution of the warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Courts to authorize execution of the wmTant at any time in the day or night.

## CONCLUSION

31. For the foregoing reasons, I respectfully submit that there is probable cause to believe that the **Target Cell Phones** presently contain or constitute evidence of violations of 21 U.S.C. § 841(a)(l), that is, possession with intent to distribute controlled substances; 18 U.S.C.

§§ 922(g)(l), that is, being a felon in possession of a fireann; and also 18 U.S.C. § 924(c), that is, possession of a fireaim in fmtherance of drug trafficking c1ime.

32. I therefore request a waITant to search the **Target Cell Phones** described in Attachments Al-A2 for the items set f01th in Attachment B.

I declare under penalty of pe1jmy that the above is true and c01Tect to the best of my knowledge and belief.

Respectfully submitted,

Jeremy Gragg
Detective
Kansas City Missouri Police Depaitment

Subscribed and sworn to before me via reliable electronic means on __4th__ day of December 2024.

By telephone at 11:50 am

HONORABLE W. BRIAN GADDY
United States Magistrate Judge
Western District of Missouri